### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHANA ORTIZ-SALGADO, | ) | CASE NO. 3:22-cv-1173 (KAD) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UCONN HEALTH, *et al.*, | ) | FEBRUARY 15, 2024 |
| *Defendants*. | ) | |

### <u>MEMORANDUM OF DECISION</u>
### <u>RE: DEFENDANTS' MOTION TO DISMISS (ECF NO. 42)</u>

Kari A. Dooley, United States District Judge:

Plaintiff Johana Ortiz-Salgado brings this employment discrimination action against her former employer, University of Connecticut Health Center ("UConn Health"), and former supervisors and coworkers, Nina Melamud, Bibi Zaneefa Mayalall, Stephen Lepowsky,[1] Heather Lavoie, Paula Eastwood, Keyla Rico Mascarell, and Judith Davila (collectively, "Defendants"). She alleges discrimination on account of her race, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, denial of Due Process and Equal Protection, as well as First Amendment retaliation, in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment, intentional infliction of emotional distress ("IIED"), and negligent infliction of emotional distress ("NIED"). Pending before the Court is Defendants' motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6). (ECF No. 42) For the reasons that follow, the motion to dismiss is GRANTED in part and DENIED in part.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[1] The Clerk of the Court is directed to amend the caption to correct the spelling of Lepowsky's last name.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Allegations**

Plaintiff was at all relevant times employed by UConn Health as a Lead Dental Assistant. Compl. at 3 ¶¶ 21–22. She is Hispanic and was born in Puerto Rico. Compl. at 3 ¶ 19. Plaintiff worked at UConn Health for approximately ten years between 2010 and 2020. Compl. at 3 ¶ 21. As Lead Dental Assistant, she supervised the Dental Assistants in the West Hartford Dental Clinic. Compl. at 3 ¶¶ 22–23. Plaintiff alleges that she was harassed, retaliated against, and constructively discharged because of her national origin, ancestry, and previous opposition to discrimination. Compl. at 3 ¶ 20.

Specifically, Plaintiff alleges that another UConn Health employee, Nina Melamud, frequently harassed her and other Hispanic employees. Compl. at 4 ¶¶ 24, 28. For example, Melamud told Zayira Cotto, who was Puerto Rican, that "Hispanic women have loud mouths and no manners." Compl. at 4 ¶ 28. This comment was witnessed by two Hispanic dental assistants.

Compl. at 4 ¶ 29. In February 2020, Melamud harassed another Hispanic Dental Assistant, Keyla

Mascarell.[2] Compl. at 5 ¶ 38.

Between April 2019 and September 2020, Plaintiff spoke to UConn Health management

about the discriminatory and "ethnically toxic atmosphere" at the Dental Clinic. Compl. at 5 ¶¶

37, 40. Plaintiff reported Melamud's discriminatory comments to her supervisor, Bibi Mayalall,

on several occasions. Compl. at 4 ¶ 26. In October 2019, upon Plaintiff's report of Melamud's

harassment, Mayalall asked Plaintiff to write an email which she would then pass along to Labor

Relations. Compl. at 4 ¶ 30. In 2019, after a "racially charged incident that included demeaning

comments about Hispanics"[3] that involved Melamud and Cotto and witnessed by Plaintiff and

others, Plaintiff sent a report via email to Human Resources. Compl. at 4 ¶ 31. Human Resources

waited several weeks to contact Plaintiff, and upon calling her through the front reception desk,

they insisted on interviewing her within hearing distance of other employees. Compl. at 4 ¶ 32.

Plaintiff subsequently reported to Mayalall that Melamud's comments continued to be a

problem, but UConn Health did not take any corrective action. Compl. at 5 ¶¶ 33–34. Although

Plaintiff spoke to UConn Health's Labor Relations Department about the situation, the department

likewise took no action. Compl. at 5 ¶ 36. At some point after the February 2020 incident with

Melamud and Mascarell, Plaintiff called a meeting with the clinic director, Yu-Hsiung Wang, to

discuss the discriminatory animus in the Dental Clinic, and particularly, the behavior of Melamud

toward Mascarell. Compl. at 5 ¶ 39. Melamud did not change her behavior and suffered no adverse

employment action or counseling. *Id.*

---

[2] At various points, the parties spell Mascarell's first name as "Keila" or "Keyla" and her last named as "Mascarell," "Macarell," or "Mescarell."

[3] It is unclear whether this "racially charged incident" was the occasion on which Melamud allegedly told Cotto that "Hispanic women have loud mouths and no manners" or whether it was a different incident.

On August 20, 2020,[4] there was an emotional interaction between Plaintiff and Melamud in the clinic before patients arrived. Compl. at 6 ¶ 45. Melamud yelled at Plaintiff, telling her that she was like all Hispanic people, "loud and without manners." Compl. at 6 ¶ 46. As a result of the interaction and stress from the ongoing harassment, Plaintiff had an anxiety attack. Compl. at 6 ¶ 47. UConn Health physician Mina Mina sent Plaintiff home. Compl. at 6 ¶ 48. Plaintiff emailed Mayalall a detailed description of the August 20, 2020 incident. Compl. at 6 ¶ 49. Without explanation or reason, Plaintiff was placed on administrative leave by UConn Health. Compl. at 6 ¶ 50. Plaintiff subsequently learned that she had been falsely accused by Melamud, Paula Eastwood, and others of allowing a non-patient into the clinic on August 20, 2020, in contravention of the clinic' COVID protocols that were in place from March 2020 to approximately July 2021 Compl. at 6–7 ¶¶ 51, 53–54.

The COVID policy included guidance that employees were to remain six feet apart and avoid indoor activities without masks. Compl. at 7 ¶ 55. Despite these protocols, certain clinic employees, including Melamud and Judy Davila, started a Zumba dance class for UConn Health employees. Compl. at 7 ¶ 56. Plaintiff learned about the Zumba class in April 2020 and that the participants were not following social distancing and masking policies. Compl. at 7 ¶¶ 57–58. Plaintiff vocally complained to other UConn Health employees and members of the community that the Zumba class sent the wrong message about their COVID policies. Compl. at 7 ¶ 59. Plaintiff believed that the class was reported to UConn Health as violating their policies. Compl. at 7 ¶ 60. She made her concerns regarding the Zumba class known to her coworkers and Mayalall, to whom she stated, "I hope we all don't pay the consequences of their actions because if we do, I will open my mouth." Compl at 8 ¶ 62.

---

[4] Plaintiff's 41-page Amended Complaint, containing 397 paragraphs, is difficult to follow as Plaintiff does not offer a clear, or even chronological, account of events.

In June 2020, UConn Health returned the Dental Clinic to West Hartford, after being moved to the main UConn Health Campus in Farmington because COVID-19. Compl. at 7 ¶ 52, 8 ¶ 64. Upon the return to West Hartford, Plaintiff's coworkers became hostile towards her. Compl. at 8 ¶ 65. Plaintiff was informed by Mascarell and Davila that UConn Health employees were treating her that way because of her complaints regarding the discriminatory environment, the Zumba class, and UConn Health's response to both the discrimination and its failure to follow COVID-19 protocols. Compl. at 8 ¶ 66. For example, in response to the Zumba class, Melamud asked a coworker why UConn kept "hiring Hispanic people for this clinic." Compl. at 9 ¶ 68. Mascarell also confronted Plaintiff, telling her that she "can't believe you reported the group of people that were involved in the Zumba class; because of you those people got a warning and Anthony Jordan" almost got fired. Compl. at 9 ¶ 69. Davila threatened Plaintiff, stating that "this is not going to stay like this." Compl. at 9 ¶ 72. Plaintiff again reported this hostility to Mayalall and other members of UConn Health's management. Compl. at 8 ¶ 67.

Following Plaintiff's complaints about the Zumba class, Melamud, Mascarell, Davila, and Paula Eastwood began a pattern of harassment and retaliation against her, to include negative comments about Hispanics and falsely accusing Plaintiff of violating UConn Health's COVID policy by letting an unauthorized individual into the Dental Clinic. Compl. at 8 ¶ 63, 9 ¶ 73. Melamud knew that this event did not happen but conspired to make intentionally false representations to perpetuate the story. Compl. at 9–10 ¶ 77–78. Melamud and another UConn Health employee, Heather Lavoie, approached an employee who worked at the Dental Clinic's front desk to email a false statement that she had witnessed Plaintiff allowing an unauthorized person into the Dental Clinic. *Id.* The front desk employee refused to make such a statement. Compl. at 10 ¶ 81. Plaintiff alleges that the false accusation was intended by Melamud, Mascarell,

Davila, Lavoie, and Eastwood to cause the termination of her employment. Compl. at 10 ¶ 80. The accusation was false because Plaintiff left the facility before any patients arrived at the clinic on August 20, 2020. Compl. at 10 ¶ 82. The coworkers who informed Plaintiff about the false accusation also told her that they were reluctant to speak to Mayalall about the issue because they were worried about Mayalall not keeping the conversation confidential and suffering retaliation at work. Compl. at 13 ¶ 110.

On August 21, 2020, there was a Lead Dental Assistant meeting at UConn Health in Farmington. Compl. at 12 ¶ 95. This was a meeting that Plaintiff would have ordinarily attended. Compl. at 12 ¶ 96. Mayalall denied Plaintiff the opportunity to attend the meeting, and when asked if she could talk to Assistant Dean Jacqueline Duncan about the racial animus and retaliation against her, she was denied. Compl. at 12–13 ¶¶ 101–102. Plaintiff then emailed Assistant Dean Duncan to request permission to attend the meeting. Compl. at 13 ¶ 103. Mayalall thereafter called Plaintiff when Mayalall learned that Plaintiff had received permission to attend the meeting from Assistant Dean Duncan, during which Mayalall raised her voice and yelled at Plaintiff for going over her." Compl. at 18 ¶ 105. Plaintiff told Mayalall that she was talking to her coworker and not a friend and that she had been begging for Mayalall's attention only to be ignored. Compl. at 18 ¶ 106. Upon Plaintiff's arrival to UConn Health, she went to Mayalall's office to discuss the hostile conditions in which was working. Compl. at 13 ¶ 107. Plaintiff demanded that Mayalall speak to staff about their behavior and creating a working environment free from racial animus. Compl. at 13 ¶ 108.

On August 28, 2020, Plaintiff was removed from the Dental Clinic in West Hartford and moved to the Farmington campus. Compl. at 14 ¶ 111.

On September 4, 2020, Plaintiff was called to a meeting with Assistant Dean Duncan, Sylvia Santos from Labor Relations, and her union representative, Randy Lebron. Compl. at 11 ¶ 84. Santos informed Plaintiff that she was there to address a "very serious accusation" of letting an unauthorized person into the Dental Clinic. Compl. at 11 ¶ 85. Afterwards, Lebron informed Plaintiff that there was nothing the union could do for her and that the Assistant Dean, Steven Lepowsky, decided to move forward with terminating her employment. Compl. at 11 ¶ 86. Lebron advised Plaintiff to resign immediately. Compl. at 11 ¶ 87. Plaintiff was four months away from fully vesting her retirement and health benefits. Compl. at 11 ¶ 89. Plaintiff also made a report of retaliation to the University of Connecticut on September 4, 2020. Compl. at 14 ¶ 115.

Plaintiff alleges that this false accusation was pretext and retaliation because the COVID policy was not enforced against other employees and following her constructive discharge, Jordan, who had organized the Zumba class, was promoted to her position. Compl. at 10 ¶ 83. Melamud was thereafter promoted to the position after Jordan. Compl. at 11 ¶ 88. Plaintiff also alleges that the harassment and retaliation by Melamud, Masacrell, Davila, and Eastwood were intended to and did in fact cause her anxiety, stress, and emotional and psychological injuries. Compl. at 12 ¶ 98.

**Discussion**

*Claims Against UConn Health – Discrimination, Retaliation, and Hostile Work Environment in Violation of Title VII (Count One)*

Defendants moves to dismiss for failure to state a claim Plaintiff's claims of racial discrimination, retaliation, and hostile work environment against UConn Health. Specifically, that Plaintiff has failed to allege that she suffered an adverse employment action in support of her discrimination and retaliation claims and failed to allege a sufficiently severe or pervasive

harassment in support of her hostile work environment claim. Plaintiff argues that she has adequately plead an adverse employment action and a hostile work environment to survive dismissal pursuant to 12(b)(6).

### Discrimination

"Title VII makes it 'an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 199 (2d Cir. 2017) (quoting 42 U.S.C. § 2000e-2(a)(1)). Discrimination claims under Title VII are analyzed using the *McDonnell Douglas* burden-shifting framework. *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006). The *McDonnell Douglas* test proceeds as follows: (1) plaintiff "bears the minimal burden of setting out a prima facie discrimination case," (2) if plaintiff satisfies its burden, plaintiff "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action," and (3) if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

To establish a *prima facie* discrimination case, plaintiff must show: (1) "[she] belonged to a protected class," (2) "[she] was qualified for the position," (3) "[she] suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted). If a plaintiff does not have direct evidence of discriminatory intent, plaintiff may present evidence of disparate treatment, such as evidence

that her employer treated her less favorably than similarly situated employees outside of her protected class, to support an inference of discriminatory intent. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 89–90 (2d Cir. 2019) (citing *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).

"An adverse [employment] action is a 'materially adverse change' in the terms and conditions of employment." *Pouncey v. Town of Hamden*, No. 3:14-CV-00475 (JAM), 2017 WL 5757740, at *8 (D. Conn. Nov. 28, 2017) (citing *Sanders v. New York City Human Res. Admin.*, 361 F. 3d 749, 755 (2d Cir. 2004)). "To be adverse, the change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotation marks omitted) (citing *Sanders*, 361 F. 3d at 755).

### Retaliation

Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 41 U.S.C. § 2000e-3(a). Retaliation claims under Title VII are also analyzed using the McDonnell Douglas burden-shifting framework. *See Hicks v. Baines*, 593 F.3d at 164 (Title VII). To establish a prima facie case of retaliation, a plaintiff must show: (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a

causal connection between the protected activity and the adverse employment action. *See id.* at 844 (citation omitted).

An adverse employment action in a retaliation claim is viewed more broadly than an adverse employment action in a discrimination claim. For retaliation purposes, the standard is "whether the action taken by the employer is 'materially adverse,' meaning 'harmful to the point that [the action] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *John v. Walmart Store No. 2585*, No. 3:21-cv-1285 (MPS), 2023 WL 2346577, at *8 (D. Conn. Mar. 3, 2023) (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (same). Although the standard for assessing whether an action is materially adverse is objective, "context matters." *Hicks*, 593 F.3d at 165 (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 69 (2006). A materially adverse action "is not limited to discriminatory actions that affect the [plaintiff's] terms and conditions of employment" in the strict sense, such as a plaintiff's pay or job responsibilities. *White*, 548 U.S. at 64. Rather, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace." *Id.* at 63 (emphasis removed).

Where "an employer deliberately fails to remedy alleged harassment out of retaliation for engaging in protected activity, such failure may be actionable under Title VII when it leads to an adverse employment action, such as constructive discharge." *Wilburn v. Fleet Financial Group, Inc.*, 170 F. Supp. 2d 219, 237 (D. Conn. 2001). Similarly, an adverse employment action can be proved by showing that the employer "knew but failed to take action to abate retaliatory harassment inflicted by co-workers," and such harassment constituted a "materially adverse change in the terms and conditions of employment." *Brunson v. Bayer Corp.*, 27 F. Supp. 2d 192,

205 (D. Conn. 2002) (*citing Richardson v. New York State Dep't of Corr.*, 180 F.3d 426, 446 (2d Cir. 1999)) (citations and internal quotations omitted).

Defendants primarily argue that Plaintiff fails state a claim of race discrimination and retaliation under Title VII because she failed to allege an adverse employment action.[5] Plaintiff contends that she has adequately plead a claim of constructive discharge to satisfy Title VII's requirement of an adverse employment action. At this state of the litigation, the Court agrees with Plaintiff.

"[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino v. Bell Atlantic*, 385 F. 3d 210, 229 (2d Cir. 2004) (internal quotation marks and citation omitted). A constructive discharge claim thus requires two elements: "the employer's intentional conduct and the intolerable level of the work conditions." *Id.* With respect to the former, a plaintiff must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" *Id.* at 229–30 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F. 3d 62, 74 (2d Cir. 2000)). With respect to the second element, the United States Supreme Court has explained that "[t]he inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). It has further instructed that a constructive discharge claim "can be regarded as an aggravated case of [ ] sexual

---

[5] Defendants also assert that Plaintiff not being able to attend the Lead Dental Assistant meeting on August 20, 2020 was not an adverse employment action because she was ultimately allowed to attend the meeting and Plaintiff's transfer from the West Hartford Dental Clinic to the Farmington campus was not an adverse employment action because she failed to allege that the relocation affected her shifts, duties, title, or pay. The Court agrees and does not address these arguments further. Notably, Plaintiff failed to address these arguments and these claims are therefore deemed abandoned. *See Tracey v. Dept. of Social Servs.*, No. 3:17-cv-745 (KAD), 2019 WL 2526299, at *9 (D. Conn. June 19, 2019).

harassment or hostile work environment,"[6] and therefore requires the plaintiff to show "something more" than what is sufficient for those claims. *Id.* at 146–47. Accordingly, the Second Circuit has consistently held that the constructive discharge standard is "a demanding one," which cannot be satisfied by merely difficult or unpleasant working conditions. *Miller v. Praxair, Inc.*, 408 F. Appx. 408, 410 (2d Cir. 2010); *see also Martin v. Citibank, N.A.*, 762 F. 2d 212, 221 (2d Cir. 1985).

Defendants state that "the incidents supporting any constructive discharge claim began in 2019, continued for months prior to her resignation, and in total spanned over a year." Def. Br. at 16. Defendants contend that because the workplace conditions did not "ratchet" up prior to her resignation, Plaintiff cannot state a claim of constructive discharge at the moment in time in which she actually resigned. Moreover, Defendants argue that any constructive discharge claim fails because Plaintiff resigned prior to any threat of termination or other disciplinary decision by UConn Health. The Court disagrees.

The Second Circuit has recently rejected the contention that a plaintiff cannot show a constructive discharge "unless the threat (a) was a categorical ultimatum that if she did not resign she would be fired, and (b) was delivered by an ultimate decisionmaker as to firing." *Green v. Town of East Haven*, 952 F.3d 394, 406 (2d Cir. 2020). Instead, a constructive discharge "could properly be found where an employer merely, albeit 'clearly[,] express his desire that [an] employee resign because such a statement' could cause a reasonable person to feel compelled to resign." *Id.* at 407. Indeed, as Defendants recognize, "the incidents supporting any constructive discharge claim began in 2019, continued for months prior to her resignation, and in total spanned over a year," and do not dispute that Melamud's alleged comments expressed a racial animus against Hispanics. Plaintiff alleges that she repeatedly made complaints about the racially hostile

---

[6] *See infra* at 14–15 for the requisite elements and standards of a hostile work environment claim.

environment she and others were experiencing in the Dental Clinic to her supervisor, other members of UConn Health management, and Labor Relations, and that even after these reports, UConn Health failed to remedy the environment. These incidents occurred over a two day period and culminated when Plaintiff was placed on administrative leave after she: had reported yet another incident of racial hostility by Defendant Melamud to her supervisor, Defendant Mayalall; had a contentious meeting with UConn Health management; and was informed by her union representative that Defendant Lepowsky had decided to terminate her and so she should resign instead (and inferentially the union representative learned that information from an ultimate decisionmaker, such as Defendant Lepowsky).

As Plaintiff observes, many of the cases cited by Defendants regarding whether dismissal of her constructive discharge claims is appropriate pertained to motions for summary judgment after the benefit of full discovery. Because the Court must construe as true Plaintiff's factual allegations and the reasonable inferences to be drawn therefrom, on a 12(b)(6) motion, the Court concludes at this juncture that Plaintiff has plausibly alleged constructive discharge under Second Circuit precedent. Although argued to the contrary by Defendants, it is also a reasonable inference that Plaintiff's placement on administrative leave and her constructive discharge were the result of race discrimination and in retaliation for her repeated complaints of harassment and discrimination. Accordingly, to the extent that Plaintiff's claims of race discrimination and retaliation against UConn Health are based on her alleged constructive discharge, [7] Defendants' Motion to Dismiss is DENIED.

---

[7] Defendants also contend that Plaintiff's placement on administrative leave with pay during the pendency of an investigation was not an adverse employment action because Plaintiff does not allege that this was not a standard application of UConn Health disciplinary processes. This factual issue shall not be resolved on a motion to dismiss. Whether her administrative leave was a standard disciplinary procedure as claimed by Defendants or whether it was part and parcel of a discriminatory course of conduct may be explored through discovery.

### Hostile Work Environment

To successfully plead a claim for hostile work environment, Plaintiff must allege facts demonstrating "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). Further, the general rule is that the hostile incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Finally, to state a claim for hostile work environment, Plaintiff must allege that the hostility occurred because of her race. *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). In sum, to determine whether Plaintiff "suffered a hostile work environment, [the Court] must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn v. City of New York*, 795 F.3d 297, 321 (2d Cir. 2015).

Where alleged harassment is "attributable to a co-worker, not a supervisor," a plaintiff must show that her employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996). In this context, "an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take

appropriate remedial action." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 225 (2d Cir. 2004). It remains the plaintiff's responsibility to offer an evidentiary basis for holding the employer liable for co-worker harassment: "Once a plaintiff has established the existence of a hostile workplace, she must then demonstrate that the harassing conduct which created the hostile situation should be imputed to the employer." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 64 (2d Cir. 1998) (quotation marks omitted).

Because the Court has already concluded that Plaintiff has sufficiently plead a claim for constructive discharge, the Court likewise concludes that Plaintiff has sufficiently plead a claim for hostile work environment. *See Penn. State Police v. Suders*, 542 U.S. at 146–47 (explaining that a constructive discharge claim "can be regarded as an *aggravated* case of [ ] sexual harassment or hostile work environment," and therefore requires the plaintiff to show "something more" than what is sufficient for those claims) (emphasis added). Moreover, an "employer that has knowledge of a hostile work environment has a duty to take reasonable steps to remedy it." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998). Plaintiff has also sufficiently plead that she told her supervisor, other members of UConn Health management, and Labor Relations on numerous occasions that she was experiencing a hostile work environment on the basis of her race and ethnicity. Accordingly, Defendants' motion to dismiss Plaintiff's hostile work environment claim is DENIED.

*Claims Against Individual Defendants – 42 U.S.C. § 1983; First Amendment Retaliation (Counts Two through Nine)*

### Plaintiff's Coworkers

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94

(1979) (citing *Baker v. McCollan*, 443 U.S. 137, 144 & n.3 (1979)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived [her] of a federal right." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999). A plaintiff making a First Amendment retaliation claim under § 1983 must demonstrate that (1) her speech was constitutionally protected, (2) she suffered an adverse employment decision, and (3) a causal connection exists between her speech and the adverse employment action. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

The Second Circuit has defined an adverse employment action under § 1983 broadly, explaining that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. We also have held that lesser actions may meet the adversity threshold, but we have not explicitly defined what quantum of lesser actions constitutes an adverse employment action." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (internal quotation marks and citations omitted). Indeed, whether an undesirable employment action qualifies as being "adverse" is a heavily fact-specific, contextual determination. *See, e.g.*, *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'"). In the First Amendment retaliation context, "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006).

Defendants move to dismiss Plaintiff's claims of First Amendment retaliation brought pursuant to § 1983 against her coworkers, Defendants Melamud, Lavoie, Mascarell, Davila and Eastwood on the ground that their conduct was not "under color of state law." Plaintiff argues to

the contrary insofar as they were all employed by UConn Health, an arm of the State of Connecticut.

"Mere employment by a state . . . does not automatically mean that a defendant's actions are taken under the color of state law." *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) (citing *Polk County v. Dodson*, 454 U.S. 312, 319–20 (1981)); *see also Buzzi v. Gomez*, 24 F. Supp. 2d 1352, 1359 (S.D. Fla.1998) ("Government employment alone, however, is insufficient."). Rather, state action "requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (internal quotation omitted); *see also Annunziato v. The Gan, Inc.*, 744 F.2d 244, 249 (2d Cir. 1984). Conduct by employees "in the ambit of their personal pursuits are plainly excluded" from § 1983 liability. *Pitchell v. Callan,* 13 F.2d 545, 548 (2d Cir. 1994). *See also Quinn v. Nassau County Police Dept.,* 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999) ("In a case charging hostile environment . . . harassment, 'under color of state law' ordinarily requires that the harasser be a supervisor or have some position of authority or control over the plaintiff."). Indeed, in the harassment context, as opposed to the First Amendment context, courts have rejected the contention that co-worker harassment occurs under color of law "when the harassment did not involve use of state authority or position." *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992) (citing cases).[8]

Plaintiff's allegations that her co-workers retaliated against her by creating the "false construct" or by some other means fail because her co-workers were not acting under color of state law. They were merely state employees, subordinate to Plaintiff, and lacked any power either to

---

[8] Plaintiff does not allege an equal protection claim under the Fourteenth Amendment resulting from the alleged harassment based upon her ethnicity. She alleges only a First Amendment retaliation claim.  Notwithstanding, had she endeavored to do so, those claims would fail for the same reason.

compel her to act or to take official action as to her employment. Accordingly, Defendants' motion to dismiss counts two, five, six, seven, eight and nine, the First Amendment retaliation claims against Defendants Melamud, Lavoie, Mascarell, Davila, and Eastwood, is GRANTED.

### Plaintiff's Supervisors

Defendants also argue that Plaintiff has failed to state a First Amendment retaliation claim against her supervisors, Defendants Mayalall and Lepowsky,[9] because she has failed to allege their direct personal involvement in the constitutional violation and that Plaintiff did not suffer an adverse employment action.[10] Plaintiff disagrees.

An individual may not be held liable under § 1983 "merely because [s]he held a high position of authority," or on a theory of vicarious liability, but can be liable only if she was "personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004); *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015). Previously, personal involvement of a supervisor could be shown not only by the supervisor's direct participation in the alleged constitutional violation,[11] but also by *her grossly negligent supervision of subordinates who committed the wrongful acts or her exhibition of deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring*. *Back*, 365 F.3d at 127 (emphasis added). More recently, the Second Circuit made clear that "there is no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Direct involvement is required. *Id.*

The Court agrees that Plaintiff has only set forth threadbare conclusory allegations that Lepowsky was in any way personally involved in the alleged First Amendment violation. Plaintiff

---

[9] Defendants do not argue that Defendants Mayalall or Lepowsky were not acting under color of state law.
[10] Defendants do not argue that Plaintiff's speech was not protected by the First Amendment.
[11] Direct involvement may be demonstrated where the supervisor knew of but failed to remedy the constitutional deprivation.

has not alleged any facts to support the conclusion, or even the inference, that Lepowsky was aware of Plaintiff's complaints or that those complaints had any role in his alleged decision to go forward with terminating her employment.

However, under the standards for assessing a complaint under Rule 12(b)(6), the Court concludes that Plaintiff has plausibly alleged that Defendant Mayalall was sufficiently personally involved in the alleged retaliation in violation of Plaintiff's First Amendment rights. While it is far from clear the extent to which Mayalall's conduct resulted in or even contributed to the alleged constructive discharge, Plaintiff has alleged that she made repeated complaints to Mayalall about Melamud's ethnic and racial animus against Plaintiff and other Hispanic employees at the Dental Clinic, and that Mayalall took no action to remedy the discriminatory atmosphere. Moreover, Plaintiff alleges that she reported to Mayalall the racially hostile incident involving Plaintiff and Melamud on August 20, 2020, after which Mayalall informed Plaintiff that she was being placed on administrative leave. And, while Plaintiff was ultimately allowed to attend the Lead Dental Assistant meeting, she has alleged that she asked Mayalall if she could bring her complaints of racial animus to Assistant Dean Duncan but was denied. Subsequently, Plaintiff alleges that Mayalall yelled at Plaintiff and was upset that Plaintiff had gone over Mayalall's head to ask Assistant Dean Duncan for permission to attend the Lead Dental Assistant meeting. It is therefore a reasonable inference that Mayalall took no action or failed to report Melamud's discriminatory treatment of Plaintiff and others, prevented Plaintiff from bringing her concerns about the racial animus in the Dental Clinic to a higher up supervisor, and allowed her coworker's false construct to perpetuate until Plaintiff resigned in lieu of termination. A party may directly participate in the alleged deprivation even if that party was not responsible for the ultimate adverse action; the defendant will be liable so long as she "played a meaningful role in the [employment decision]."

*Back*, 365 F.3d at 125–26 (internal citations and quotation marks omitted). Indeed, had Defendant Mayalall not conducted herself as she did, the ultimate decision maker might have had greater context and information when making the decision to proceed with Plaintiff's termination. This issue is left to the discovery and fact-finding process.

Accordingly, Defendants' motion to dismiss counts four and six alleging First Amendment retaliation against Defendant Lepowsky is GRANTED. The motion to dismiss count three alleging First Amendment retaliation against Defendant Mayalall is DENIED.

*State Law Claims — Intentional Infliction of Emotional Distress against Defendant Melamud (Count Ten)*

Defendants seek dismissal of Plaintiff's IIED claim against Defendant Melamud on the grounds that this claim is barred by Connecticut General Statutes § 4-165[12] and that the allegations, even if proven, do not rise to the level necessary to state a claim for IIED under Connecticut law. Plaintiff counters that Connecticut General Statutes § 4-165 does not apply but does not otherwise address Defendant's second argument. The Court need not wade into whether the allegations are outside the scope of § 4-165 immunity because it agrees that Plaintiff's allegations are not sufficiently egregious to state an IIED claim.

In Connecticut, to state a claim of intentional infliction of emotional distress, Plaintiff must allege: (1) that the Defendant intended to inflict emotional distress or knew or should have known that such distress was a likely result of its conduct; (2) that the conduct was extreme and outrageous; (3) that the Defendant's conduct was the cause of Plaintiff's distress; and (4) that the emotional distress sustained by the Plaintiff was severe. *See Appleton v. Bd. of Educ. of Town of*

---

[12] Section 4-165 provides that "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment." Conn. Gen. Stat. Section 4-165(a).

*Stonington*, 254 Conn. 205, 210 (2000) (citing *Petyan v. Ellis*, 200 Conn. 243, 253 (1986)). Extreme and outrageous conduct is defined as conduct that "exceeds all bounds usually tolerated by decent society." *Crocco v. Advance Stores Co. Inc.*, 421 F. Supp. 2d 485, 503 (D. Conn. 2006) (internal quotation marks omitted) (citing *Carrol v. Allstate Insurance Co.*, 262 Conn. 433, 443 (2003)). It is conduct that is "regarded as atrocious, and utterly intolerable in a civilized community . . . [where] recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!" *Appleton*, 254 Conn. at 211 (citation and internal quotation marks omitted).

Conduct that is "merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." *Id.* (internal quotation marks omitted). Whether "conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the court." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (citing *Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 552 (D. Conn. 1996)). Only where reasonable minds might disagree does it become an issue for the jury. *Di Teresi v. Stamford Health System, Inc.*, 142 Conn. App. 72, 87 (2013).

Plaintiff's allegations simply do not rise to the level of extreme and outrageous conduct as required under Connecticut law. Melamud is alleged on various occasions to use disparaging language about Hispanic people and to have created a "false construct" so Plaintiff would lose her employment with UConn Health.

Even if proven, the conduct and the motive combined do not amount to "atrocious" conduct or conduct that is "utterly intolerable in a civilized community." *See Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 527 (2012) (where defendants told plaintiff that her career was in

jeopardy during a performance evaluation and thereafter transferred her to a different school, no juror could conclude that the conduct was "beyond all possible bounds of decency . . . atrocious, and utterly intolerable in a civilized community"); *Tracy v. New Milford Public Schools*, 101 Conn. App. 560, 562–70 (2007) (motion to strike IIED claim properly granted where plaintiff claimed that defendants conspired to engage in a pattern of harassment including denial of a position, initiation of disciplinary actions without proper investigation, and defamation and intimidation of plaintiff), cert. denied, 284 Conn. 910 (2007); *Appleton*, 254 Conn. at 211–12 (summary judgment against plaintiff on IIED claim was proper where defendants made condescending comments about plaintiff in front of colleagues, questioned plaintiff's vision and ability to read, informed plaintiff's daughter that she was acting differently and should take time off, asked police to escort plaintiff from school, required plaintiff to subject herself to psychiatric testing, forced plaintiff to take leave of absence, suspended plaintiff, and forced plaintiff to resign); *see also Allen v. Egan*, 303 F. Supp. 2d 71, 78 (D. Conn. 2004) ("Although employment discrimination is illegal, it does not per se give rise to a claim for intentional infliction of emotional distress."); *Koestner v. Derby Cellular Prod.*, 518 F. Supp. 2d 397, 403 (D. Conn. 2007) (same). The motion to dismiss as to count ten is GRANTED.

*Negligent Infliction of Emotional Distress against Nina Melamud (Count Eleven)*

Defendants seek dismissal of Plaintiff's NIED claim on the grounds this claim is barred by Connecticut General Statutes § 4-165 and in light of Connecticut Supreme Court precedent that claims for NIED in the employment context may only arise in the termination process. Plaintiff counters that Connecticut General Statutes § 4-165 does not apply but does not otherwise address Defendant's second argument. The Court does not address the applicability of § 4-165 because it agrees that Plaintiff's allegations do not arise in the termination process.

A plaintiff seeking to recover for negligent infliction of emotional distress must demonstrate that: "'(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.'" *Vega v. Sacred Heart Univ., Inc.*, 871 F. Supp. 2d 81, 85 (D. Conn. 2012) (quoting *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003)). A plaintiff, however, cannot bring such a claim for acts occurring during an ongoing employment relationship, because "[n]egligent infliction of emotional distress in the employment context arises only when it is based upon unreasonable conduct of the defendant in the termination process." *Grasso v. Connecticut Hospice, Inc.*, 138 Conn. App. 759, 771 (2012) (quoting *Perodeau v. Hartford*, 259 Conn. 729, 750 (2002)). "The Connecticut Supreme Court has not specifically ruled on the temporal boundaries of the termination process. However, the reasoning in *Perodeau* makes clear that this process does not begin . . . at the action that causes the employer-employee relationship to deteriorate." *Tomick v. United Parcel Serv., Inc.*, 511 F. Supp. 2d 235, 238 (D. Conn. 2007) (quotation marks and citation omitted).

Further, most courts applying the rule in *Perodeau* to NIED claims do so when an employee has been actually terminated, which is often the cause for the emotional distress itself, rather than where Plaintiff alleges constructive discharge. *See, e.g.*, *Watson v. Wheeler Clinic, Inc.*, No. 3:21-cv-0503 (MPS), 2022 WL 2916825 (D. Conn. July 25, 2022); *Grande v. Hartford Bd. of Educ.*, No. 19-cv-00184 (KAD), 2020 WL 70815 (D. Conn. Jan. 7, 2020); *Michaud v. Farmington Cmty. Ins. Agency*, No. CV010806951S, 2002 WL 31415478 (Conn. Super. Ct. Sept. 25, 2002).

Nor has the Court located any case where a viable NIED claim was brought against a co-worker, as opposed to the individual involved in or responsible for the termination itself. For

example, in *Torres-Hicks v. Connecticut Housing Finance Authority*, 575 F. Supp. 2d 393, 406–407 (D. Conn. 2008), Judge Thompson explained that liability for a plaintiff's NIED claims against two co-workers whose false allegations led to his termination would be "inconsistent with the rationale for the holding in *Perodeau*" because "employees are expected and encouraged to report suspected wrong-doing."

For all of these reasons, the motion to dismiss count eleven is GRANTED.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss Plaintiff's Title VII claims against UConn Health (Count One) is DENIED. Defendants' motion to dismiss Plaintiff's First Amendment retaliation claims against Defendant Mayalall (Count Three) is DENIED. The motion to dismiss is GRANTED in all other respects with prejudice. The Clerk of the Court is directed to terminate Defendants Lepowsky, Melamud, Lavoie, Mascarell, Davila, and Eastwood.

The stay of discovery is lifted. The remaining parties shall confer and submit a proposed amended scheduling order on or before February 29, 2024. Defendants shall file an answer to the Amended Complaint on or before February 29, 2024.

**SO ORDERED** at Bridgeport, Connecticut, this 15th day of February 2024.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE